**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------

**ELI VERSCHLEISER,**

                              **Plaintiff,**          **22-cv-7909 (JGK)**

          **- against -**                      **MEMORANDUM OPINION**
                                            **AND ORDER**
**JACOB FRYDMAN, ET AL.,**

                              **Defendants.**
--------------------------------------------------

**JOHN G. KOELTL, District Judge:**

        The pro se plaintiff, Eli Verschleiser, brought this action

against multiple defendants, including his former business partner

Jacob Frydman, alleging principally that the defendants carried

out a coordinated campaign to harm and disparage the plaintiff

in the wake of the plaintiff's separation from his shared real

estate venture with Frydman. The plaintiff's complaint asserts

federal claims pursuant to the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., the Lanham

Act, 15 U.S.C. § 1125, the Computer Fraud and Abuse Act ("CFAA"),

18 U.S.C. § 1030, and the Electronic Communications Privacy Act

("ECPA"), 18 U.S.C. § 2511, as well as several state-law claims.

The defendants have collectively filed five motions to dismiss,

seeking dismissal of the complaint on various grounds. For the

reasons set forth below, the motions to dismiss are **granted,** and

the plaintiff's complaint is **dismissed with prejudice.**

**I.**

The following facts are taken from the complaint, ECF No. 1 ("Compl."), and are accepted as true for purposes of the motions to dismiss in this case.[1]

The plaintiff is the Chief Executive Officer and Chairman of Multi Capital Group of Companies ("Multi Group"), a private real estate investment firm, as well as a principal in several other real estate businesses. See Compl. ¶ 34. In mid-2011, the plaintiff partnered with defendant Jacob Frydman to form various real estate entities, including three entities named as defendants in this case: United Realty Advisors, LP, United Realty Partners, LLC, and a public real estate investment trust ("REIT") known as United Realty Trust Incorporated (collectively, the "United Realty Entities"). See id. ¶¶ 35, 39 & n.1. The plaintiff invested more than $12 million in this shared real estate venture and served as the President, while Frydman, who was the Chief Executive Officer and Chairman, invested less than $1.25 million. See id. ¶¶ 1, 36.

In addition to Frydman and the United Realty Entities, the other defendants include several corporate entities and limited liability companies allegedly under Frydman's control, namely the Jacob Frydman 2000 Irrevocable Trust, the Monica Libin 2000

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, omissions, emphasis, quotation marks, and citations in quoted text.

Irrevocable Trust, Frydco Capital Group, LLC, 500 Lincoln Owner LLC, Ledgerock LLC, JFURTI, LLC, Summer Investors LLC, and Winter Investors LLC, as well as Mercer Street Partners LP ("Mercer"), another real estate business in which Frydman was involved (all together, the "Frydman Entities"). The defendants also include Frydman's spouse, Monica Libin Frydman; various individuals who were affiliated with Frydman or his businesses during the relevant period, namely Craig Gould, Nicolae Constantinescu, Alexander Libin, and Joe Levine; Levick Strategic Communications, LP and its employee Eric Lebson (the "Levick Defendants"); and three attorneys associated with Frydman's businesses, namely Daniel Edelman, Lanny Davis, and Andrew Hayes.

The plaintiff alleges that in the course of his real estate partnership with Frydman, the plaintiff discovered that Frydman had improperly listed some of their shared businesses as "assets" of certain Frydman Entities, in order to induce lenders to invest with Frydman and entities under his sole control. Id. ¶ 42. The plaintiff also claims to have discovered that Frydman was using his various corporate entities to "pay funds to himself," "conceal assets," "evad[e] investors," and "avoid the reach of creditors." Id. ¶¶ 43-44. Upon uncovering this allegedly "fraudulent conduct," the plaintiff terminated Frydman's employment in their real estate business for cause. Id. ¶ 45.

To avoid the public disclosure of his termination pursuant to applicable SEC regulations, Frydman allegedly approached the plaintiff and asked to negotiate an alternative arrangement. Id. ¶¶ 46-47. In December 2013, the plaintiff and Frydman entered into a Separation Agreement, which provided that the plaintiff would rescind Frydman's termination and "voluntarily resign" from their real estate venture in exchange for Frydman's agreement to pay 50% of all future proceeds to the plaintiff. Id. ¶ 49. Frydman also agreed that he would "not disparage or encourage or induce others to disparage [the] [p]laintiff or his businesses" for 18 months following the plaintiff's separation. Id. ¶ 50.

The plaintiff alleges that, notwithstanding the Separation Agreement, Frydman immediately "embarked on a mission to destroy [the] [p]laintiff." Id. ¶ 51. Specifically, the plaintiff claims that Frydman and various other defendants, often operating through the United Realty Entities and certain of the Frydman Entities, orchestrated a "multi-faceted campaign" to harm the plaintiff and his businesses. Id. ¶¶ 68, 70. For example, beginning in 2014, Frydman and other defendants allegedly created a "barrage" of emails, websites, videos, and other internet posts that disparaged the plaintiff and his businesses. See id. ¶ 150. These materials included a series of disparaging videos "made from distortions" of deposition testimony given by the plaintiff on July 23, 2014. Id. ¶¶ 160-61. The plaintiff alleges that both Constantinescu and

4

Libin were "involved" in the posting of these videos on YouTube. See id. ¶ 160. The plaintiff also claims that Frydman recruited Constantinescu, Libin, Davis, and the Levick Defendants to craft www.thetruthabouteliverschleiser.com, a false and disparaging website about the plaintiff. See, e.g., id. ¶¶ 152, 154, 158-59.

In February 2015, the Levick Defendants and Davis allegedly assisted Frydman with a press release and related press conference in which Frydman and Davis made false and derogatory statements about the plaintiff. See id. ¶¶ 72-74, 165-71. During the press conference on February 23, 2015, Frydman accused the plaintiff of engaging in various forms of wrongdoing, including hacking into Frydman's computers and using anonymous websites to disparage Frydman. See id. ¶¶ 166-69. Davis is alleged to have stated that the plaintiff should be investigated for such conduct. Id. ¶ 169.

Later, in April 2015, certain defendants allegedly hacked into the plaintiff's computer and obtained personal information, as well as a list containing email addresses for hundreds of the plaintiff's business contacts. See id. ¶¶ 121, 274. Then, on April 27, 2015, Frydman and other defendants sent false and disparaging emails about the plaintiff to all of the contacts on that list. See id. ¶¶ 122, 275. The emails, which were sent from an address called thetruthabouteliverschleiser@gmail.com, featured a header for "An Introduction to Eli Verschleiser" and contained a link to www.thetruthabouteliverschleiser.com, the disparaging website

described above. Id. ¶¶ 122, 155. The plaintiff claims that these emails, along with the other disparaging materials and messages, induced "numerous" entities and individuals to cease doing business with the plaintiff and his companies. Id. ¶ 123.

The plaintiff also alleges that Frydman, with the assistance of other defendants, has manipulated and abused legal proceedings to harm the plaintiff in various ways. For example, the plaintiff claims that shortly after his 2013 separation from the real estate partnership, Frydman "retaliat[ed]" against the plaintiff with "numerous different sham lawsuits." Id. ¶¶ 53, 55. These lawsuits marked the beginning of a wave of "frivolous" litigation in which Frydman and other defendants sued the plaintiff. See id. ¶¶ 144-45. The plaintiff also alleges that Frydman and Davis, "us[ing] [their] political influence," were able to persuade prosecutors to initiate futile proceedings against the plaintiff in 2014 and 2015. Id. ¶¶ 146-47, 170.

As Frydman's lawsuits against the plaintiff unfolded, the defendants allegedly continued to disparage the plaintiff through "false and fraudulent" court submissions. Id. ¶¶ 125-26. As one example, the plaintiff alleges that Gould falsified a December 29, 2014 sworn declaration in which he stated that the plaintiff had confessed to posting defamatory webpages about Frydman. See id. ¶¶ 104, 126. The Complaint also alleges that Frydman falsified portions of certain court documents and used fabricated deposition

6

testimony to create more disparaging videos about the plaintiff. See id. ¶¶ 108, 110. Additionally, Frydman allegedly threatened to sue the plaintiff's family and friends in federal RICO litigation, intimidated or paid several witnesses to secure testimony against the plaintiff, and used lawsuits against other parties to "coerce settlements" that prohibited those parties from communicating or doing business with the plaintiff. Id. ¶¶ 111-14, 128-42. To the extent dates are provided, this conduct appears to have occurred in 2014 through 2016. See, e.g., id. ¶¶ 108, 111, 137, 141.

The plaintiff alleges that as a result of the defendants' campaign of wrongdoing against him, he has suffered reputational harm and emotional distress, as well as financial injury from the loss of existing and anticipated business opportunities. Based on these allegations, the complaint asserts claims for violations of RICO and conspiracy to violate RICO, 18 U.S.C. §§ 1962(c)-(d); violations of the CFAA and conspiracy to violate the CFAA, 18 U.S.C. §§ 1030(a)-(b); violations of the ECPA, 18 U.S.C. § 2511; and violations of the Lanham Act, 15 U.S.C. § 1125(a), namely unfair competition and false designation of origin. The complaint also asserts state-law claims for fraud, tortious interference with prospective business relations, injurious falsehood, prima facie tort, and intentional infliction of emotional distress. With the exception of one of the Lanham Act counts, the plaintiff brings

each cause of action against all of the defendants.[2] The plaintiff seeks hundreds of millions of dollars in actual damages, as well as punitive damages and injunctive relief.

The complaint was filed on September 14, 2022. ECF No. 1. Since then, various defendants have filed motions to dismiss the claims against them. These defendants include: (1) Frydman, Monica Frydman, Libin, Levine, Gould, Constantinescu, and all the Frydman Entities (together, the "Frydman Defendants"), who seek dismissal pursuant to Federal Rules of Civil Procedure 12(b)(6) and 41(b), see ECF No. 55; (2) the Levick Defendants, who seek dismissal pursuant to Rules 12(b)(2), 12(b)(6), and 41(b), see ECF No. 73; (3) Davis, who seeks dismissal pursuant to Rules 12(b)(2) and 12(b)(6), see ECF No. 95; (4) Hayes, who seeks dismissal pursuant to Rule 12(b)(6), see ECF No. 100; and (5) Edelman, who seeks dismissal pursuant to Rules 12(b)(6), 41(a)(1)(B), and 41(b), see ECF No. 69. The plaintiff has filed an "omnibus" opposition in response to all of these motions. Pl.'s Opp'n, ECF No. 102.

For the reasons set forth below, the motions to dismiss are **granted**, and the complaint is **dismissed with prejudice.**

---

[2]  The plaintiff's Complaint splits the Lanham Act cause of action into two counts. The first count, styled as a count for "Direct Violations of the Lanham Act," is asserted against only Frydman, Monica Frydman, Davis, Libin, Constantinescu, the Levick Defendants, and the United Realty Entities. See Compl. ¶¶ 203-22 (Count III). The second count, styled as a count for "Lanham Act Injunctive Relief," is asserted against all of the defendants. Id. ¶¶ 223-27 (Count IV).

## II.

A subset of the defendants, namely the Levick Defendants and Davis, have moved to dismiss the plaintiff's claims against them for lack of personal jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2). On a Rule 12(b)(2) motion to dismiss, the plaintiff bears the burden of establishing that the Court has personal jurisdiction over the defendants. Friedman v. Bloomberg L.P., 884 F.3d 83, 90 (2d Cir. 2017). However, in this case, the plaintiff has not even attempted to make the necessary showing. The plaintiff's opposition papers do not include any response to the contention that the Court lacks personal jurisdiction over Davis or the Levick Defendants; indeed, those opposition papers do not mention personal jurisdiction at all. Accordingly, the plaintiff has abandoned any argument that the Levick Defendants and Davis are subject to personal jurisdiction in this Court. See, e.g., Berdeaux v. OneCoin Ltd., 561 F. Supp. 3d 379, 399 (S.D.N.Y. 2021) (plaintiff "abandoned all bases for personal jurisdiction" that were left unaddressed in response to a Rule 12(b)(2) motion to dismiss); Ritchie Cap. Mgmt., L.L.C. v. Costco Wholesale Corp., No. 14-cv-4819, 2015 WL 13019620, at *6 (S.D.N.Y. Sept. 21, 2015) ("Plaintiffs do not respond to these arguments . . . and therefore they have abandoned the argument that specific jurisdiction applies here."); Felske v. Hirschmann, No. 10-cv-8899, 2012 WL 716632, at *3 (S.D.N.Y. Mar. 1, 2012) (plaintiffs "effectively conceded that

there [was] no basis for [personal] jurisdiction" under a long-arm provision because they "fail[ed] to respond to this argument in their memoranda of law"). The plaintiff's claims against Davis and the Levick Defendants should be dismissed for this reason alone.

## III.

All of the defendants have moved to dismiss the plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6) and, to the extent applicable, Federal Rule of Civil Procedure 9(b).

In deciding the defendants' Rule 12(b)(6) motions to dismiss for failure to state a claim, the Court must accept the allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). To survive a motion to dismiss, the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. While the Court should construe the factual allegations in the light most favorable to

10

the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

Because the plaintiff is proceeding pro se, the Court must construe the complaint "liberally and interpret it to raise the strongest arguments that it suggests." Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010). "Even in a pro se case, however, . . . threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Thus, although the Court is "obligated to draw the most favorable inferences" that the complaint supports, the Court "cannot invent factual allegations that [the plaintiff] has not pled." Id.

When presented with a motion to dismiss, the Court may consider documents attached to or referenced in the complaint, documents that the plaintiff either possessed or knew about and relied on in bringing the lawsuit, or matters of which judicial notice may be taken. See Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002); Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). In particular, courts may take judicial notice of court documents and other public records. See Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991); U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras, No. 98-cv-3099, 2001 WL 300735, at *9 n.7 (S.D.N.Y. Mar. 27, 2001) (taking judicial notice of "relevant pleadings, motion papers, orders, and judgments

in [a] [separate] [c]ourt [a]ction" in resolving a Rule 12(b)(6) motion to dismiss). The purpose of taking judicial notice of such documents is to determine what statements the documents contained, not to establish the truth of the matters asserted therein. See Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007); Kramer, 937 F.3d at 774 ("[C]ourts routinely take judicial notice of documents filed in other courts . . . to establish the fact of such litigation and related filings.").

In this case, the defendants argue that the plaintiff's complaint must be dismissed pursuant to Rule 12(b)(6) because all of the claims are time-barred under the relevant statutes of limitations. The defendants also contend that the plaintiff has failed to allege certain elements of his claims in accordance with the pleading standards of Rule 12(b)(6) and, in some instances, Rule 9(b). The Court addresses these issues in turn.

**A.**

The Second Circuit Court of Appeals has explained that "[d]ismissal under [Rule] 12(b)(6) is appropriate when a defendant raises . . . a statutory bar as an affirmative defense and it is clear from the face of the complaint, and the matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008); Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000); see Merryman v. J.P.

Morgan Chase Bank, N.A., 319 F.R.D. 468, 470 (S.D.N.Y. 2017) ("[A] statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint."). In this case, the plaintiff's own allegations make plain that the time to bring each of his claims expired long before September 14, 2022, the date on which the complaint was filed. Accordingly, all of the plaintiff's claims must be dismissed as time-barred.

## 1. RICO Claims

First, the defendants argue that the plaintiff's RICO claims are time-barred because those claims accrued more than four years before the commencement of this action on September 14, 2022. "RICO claims are subject to a four-year statute of limitations," Koch v. Christie's Int'l PLC, 699 F.3d 141, 148 (2d Cir. 2012), which "begins to run when the plaintiff discovers or should have discovered the RICO injury," In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 58 (2d Cir. 1998); accord Zirvi v. Flatley, 838 F. App'x 582, 585 (2d Cir. 2020). Thus, the four-year statute of limitations is activated when the plaintiff is placed on "inquiry notice" of the injury -- that is, when the plaintiff has encountered "sufficient 'storm warnings' to trigger [a] duty to inquire." Koch, 699 F.3d at 153; Fire & Police Pension Ass'n of Colo. v. Bank of Montreal, 368 F. Supp. 3d 681, 707-08 (S.D.N.Y. 2019). "Storm warnings" are "circumstances [that] would suggest to a[] [person] of ordinary intelligence the probability that

13

she has been defrauded." <u>Koch</u>, 699 F.3d at 151. Such warnings
"need not detail every aspect" of the alleged scheme; rather, storm
warnings are "sufficient where[] a person of ordinary intelligence
would consider it probable that [such a scheme] had occurred."
<u>Id.</u> "An objective standard applies to inquiry notice," <u>Fire &
Police Pension Ass'n</u>, 368 F. Supp. 3d at 708, and "knowledge of
facts that would suggest to a reasonably intelligent person the
probability that the person has been injured is dispositive,"
<u>Koch</u>, 699 F.3d at 153.

In opposition to the defendants' argument, the plaintiff
contends that the alleged RICO "scheme and the resulting . . .
damages" were "unknown to [the plaintiff] until recently." Pl.'s
Opp'n at 13. But to the extent the complaint contains nonconclusory
allegations of a scheme to injure the plaintiff, those allegations
pertain to conduct that occurred between 2013 and 2016 -- and it
is clear on the face of the complaint that there were multiple
storm warnings during that timeframe. Such storm warnings included
the February 2015 press release and press conference, <u>see</u> Compl.
¶¶ 165-73, the alleged "barrage" of disparaging "emails, listing
websites, videos, and internet postings" beginning in "2014," <u>id.</u>
¶ 150, the posting of www.thetruthabouteliverschleiser.com in the
"spring of 2015," <u>id.</u> ¶ 152, and the mass emailing of that website
and other denigrating statements to "hundreds" of the plaintiff's
business contacts on April 27, 2015, <u>id.</u> ¶¶ 121-22, 155, 274-75.

The plaintiff also alleges that between 2013 and 2015, certain defendants subjected the plaintiff to a flood of sham lawsuits and proceedings, forcing the plaintiff to defend himself repeatedly and to resist coercive settlements. See, e.g., Compl. ¶¶ 111-16, 145-46. These incidents, all of which are alleged to have been carried out in furtherance of the RICO scheme, were plainly sufficient to put the plaintiff on inquiry notice of his asserted RICO injuries. Thus, the four-year RICO limitations period began to run no later than 2015,[3] meaning that the time to bring the RICO claims expired in 2019 -- long before this litigation was commenced in September 2022.[4] See Koch, 699 F.3d at 153 ("The RICO statute of limitations

---

[3] The plaintiff does allege a handful of additional acts in furtherance of the alleged RICO scheme that took place as late as December 9, 2016. See, e.g., Compl. ¶ 137(m). However, by that point, the plaintiff had already been on inquiry notice of the scheme for well over a year. To the extent the complaint refers to alleged wrongdoing affecting the plaintiff after 2016, the allegations are conclusory and devoid of any indication of timing. See, e.g., Compl. ¶ 109 ("Recently, defendants Edelman and Hayes were responsible for submitting frivolous filings and manufacturing lawsuits in an effort to facilitate the conspiracy organized by Frydman.").

[4] The Second Circuit Court of Appeals has explained that the precise starting point for the RICO limitations period "will be timed in one of two ways," depending on whether the plaintiff made "some inquiry" once the duty to inquire existed. Koch, 699 F.3d at 151. In this action, the RICO claims accrued in 2015 (and are therefore time-barred) under either approach. Assuming the plaintiff "ma[de] no inquiry," then the proper starting point for the limitations period is "the date the duty [to inquire] arose" -- here, 2015 at the latest, given the numerous storm warnings during and leading up to that year. Id. Moreover, it is clear that the plaintiff was aware of certain storm warnings and did undertake some form of inquiry as early as July 2015, because during that month, the plaintiff sued many of the same defendants for creating some of the disparaging online content at issue here. See July 7, 2015 Compl., Verschleiser v. Gould, Index No. 8604/2015 (N.Y. Sup. Ct. filed July 7, 2015), Edelman Decl., Ex. B, ECF No. 71-2. Where, as here, "some inquiry

. . . runs even where the full extent of the RICO scheme is not discovered until a later date, so long as there were 'storm warnings' that should have prompted an inquiry." (quoting World Wrestling Entm't, Inc. v. Jakks Pac., Inc., 328 F. App'x 695, 697 (2d Cir. 2009))). The plaintiff's RICO claims are therefore time-barred.

### 2. Lanham Act Claims

Next, the defendants argue that the plaintiff's Lanham Act claims are barred under the doctrine of laches. See Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 191 (2d Cir. 1996) (explaining that the Lanham Act is silent on the statute of limitations, and accordingly, defendants may invoke the doctrine of laches "instead of a statutory time-bar"). Because "[t]he Lanham Act does not

---

is made" after the duty to inquire arises, the RICO limitations period begins to run from the date on which a "reasonabl[y] diligen[t]" inquiry "should have revealed" the scheme. Koch, 699 F.3d at 151. In this case, nearly all of the alleged misconduct underlying the alleged RICO scheme, including the mass posting and emailing of disparaging material and the use of lawsuits to antagonize the plaintiff, predated the filing of the July 2015 complaint -- and accordingly, a reasonably diligent inquiry would have revealed the alleged RICO scheme around that time. The plaintiff nevertheless asserts that he did not "uncover[]" the RICO scheme "until recently," see Pl.'s Opp'n at 13, pointing to (1) his receipt of documents that supposedly revealed the scheme in 2018, and (2) a 2021 court filing in which Hayes accused Frydman of misconduct (and which, on its face, has no relation whatsoever to any scheme against the plaintiff), see Compl. ¶ 101. This argument is implausible, and in any event, it misses the point. The limitations period did not run from the time that the plaintiff became subjectively aware of the alleged RICO scheme, but instead from the time that "the exercise of reasonable diligence" "should have revealed" that scheme -- an objective standard that, in this case, yields a start date no later than 2015. Koch, 699 F.3d at 151 (emphasis added); Fire & Police Pension Ass'n, 386 F. Supp. 3d at 708.

delineate a statute of limitations period," federal courts "look
to the analogous State law to determine the limitations period
which does best to further the policies behind the Act." Mario
Valente Collezioni, Ltd. v. AAK Ltd., 280 F. Supp. 2d 244, 257
(S.D.N.Y. 2003). Thus, district courts sitting in New York "apply
New York's six-year fraud statute of limitations to determine if
a Lanham Act claim is barred by the doctrine of laches." Parks v.
ABC, Inc., 341 F. App'x 737, 739 (2d Cir. 2009); Conopco, Inc.,
95 F.3d at 191-92; Gordon & Breach Sci. Publishers S.A. v. Am.
Inst. of Physics, 859 F. Supp. 1521, 1528 (S.D.N.Y. 1994) (noting
that, in the Lanham Act context, courts look to the "most analogous
statute of limitations in the law of the forum state").

In this case, the plaintiff's Lanham Act claims are based
entirely on the alleged misuse of the plaintiff's "name, likeness
and marks" in "YouTube videos, websites, domains or subdomains,
[] Internet postings," and "advertisements." Compl. ¶¶ 205, 207-
08. And the plaintiff's nonconclusory allegations pertaining to
these materials make clear that they were created in 2014 and
2015. See, e.g., Compl. ¶ 150 (plaintiff's business associates
and investors "have encountered a barrage" of disparaging videos,
emails, and other web content "since 2014"); id. ¶ 152 (certain
defendants "creat[ed]" www.thetruthabouteliverschleiser.com in
"spring of 2015"); id. ¶ 155 (defendants sent a disparaging email
titled "An Introduction to Eli Verschleiser" on April 27, 2015);

17

id. ¶¶ 160-61 (defendants distorted plaintiff's deposition tape to create a misleading YouTube video, which, as indicated in an exhibit to the complaint, was posted "7 years" before the complaint was filed, see Compl. Ex. I, ECF No. 1-10). Indeed, in July 2015, the plaintiff brought a state court action (the "July 2015 State Court Action") against many of the same defendants to seek damages for the posting of some of this online content, undercutting any suggestion that the plaintiff was not aware of his injury until several years later. See July 7, 2015 Compl., Verschleiser v. Gould, Index No. 8604/2015 (N.Y. Sup. Ct. filed July 7, 2015) ("July 2015 State Court Compl."), Edelman Decl., Ex. B, ECF No. 71-2. The plaintiff's Lanham Act claims accordingly accrued in 2015, seven years before this action was filed. Thus, in light of the applicable six-year limitations period, the Lanham Act claims are time-barred.

### 3. CFAA Claims

The plaintiff's CFAA claims are also untimely. The CFAA provides a civil cause of action to "[a]ny person who suffers damage or loss by reason of a violation" of the statute, which prohibits unauthorized computer access in various forms. 18 U.S.C. § 1030(g). "To be timely, such a civil suit must be filed 'within 2 years of the date of the act complained of or the date of the discovery of the damage.'" Sewell v. Bernardin, 795 F.3d 337, 340 (2d Cir. 2015) (quoting 18 U.S.C. § 1030(g)).

In this case, the only nonconclusory allegations of computer hacking concern the alleged April 2015 incident in which certain defendants accessed the plaintiff's computer and obtained a list of email addresses for hundreds of the plaintiff's professional contacts. See, e.g., Compl. ¶¶ 121, 151, 274, 275. The plaintiff makes clear in the "Claims for Relief" section of his complaint that this incident is the only alleged instance of computer hacking underlying his CFAA claims. Id. ¶¶ 274-75. That computer hacking occurred about seven and a half years before this action was filed on September 14, 2022, and was plainly barred by the CFAA's two-year statute of limitations, and the plaintiff does not allege that he only discovered the intrusion into his computer several years later. Nor does the plaintiff make such an argument in response to the defendants' contention that the CFAA claim is time-barred.

Indeed, such an argument would be implausible, given the plaintiff's own allegations that the defendants used the email list to send disparaging material to "hundreds" of the plaintiff's business contacts on April 27, 2015, see Compl. ¶¶ 274-75, prompting "[n]umerous individuals and companies" to cease doing business with the plaintiff, id. ¶ 123. In view of the alleged magnitude of this sudden loss of business and the resulting financial harm, it is implausible that the plaintiff could not have discovered the source of the injury -- an outsider's use of an email list, taken

from the plaintiff's computer, to disseminate disparaging statements
to the plaintiff's professional contacts -- until September 2020
(two years before this action was commenced). Thus, the plaintiff's
CFAA claims are time-barred under the two-year statute of
limitations. See 18 U.S.C. § 1030(g).

#### 4. ECPA Claims

A two-year limitations period likewise bars the plaintiff's
claims under the ECPA, which prohibits the interception of certain
communications and the use or disclosure of intercepted information.
See 18 U.S.C. § 2511. A civil action for damages under the ECPA
"may not be commenced later than two years after the date upon
which the claimant first has a reasonable opportunity to discover
the violation." Id. § 2520(e). This statute of limitations "does
not require the claimant to have actual knowledge of the violation;
it demands only that the claimant have had a reasonable opportunity
to discover it." Davis v. Zirkelbach, 149 F.3d 614, 618 (7th Cir.
1998); Andes v. Knox, 905 F.2d 188, 189 (8th Cir. 1990) ("[T]he
[ECPA] cause of action accrues when the claimant has a reasonable
opportunity to discover the violation, not when she discovers the
true identity of the violator or all of the violators."); see
Sewell, 795 F.3d at 340 (concluding that the identically worded
statute of limitations in the Stored Communications Act, 18 U.S.C.
§ 2701, "begins to run when the plaintiff discovers that, or has
information that would motivate a reasonable person to investigate

20

whether, someone has" violated the statute). Like the CFAA claims, the ECPA claims in this case are predicated solely on the alleged April 2015 theft of the email list from the plaintiff's computer. See Compl. ¶¶ 293-94. And for reasons similar to those set forth with regard to the CFAA claims, any suggestion that the plaintiff could not have discovered the ECPA violation until September 14, 2020 (two years before the complaint was filed) is implausible. The sudden and unexpected loss of "numerous" business relationships after the mass dissemination of disparaging emails would have given the plaintiff "reason to know that something was afoot," such that the plaintiff would have had "a reasonable opportunity to discover the violation" not long after April 27, 2015. Lanier v. Bryant, 332 F.3d 999, 1004 (6th Cir. 2003); Davis, 149 F.3d at 618 ("inquiry notice" is sufficient to trigger the ECPA limitations period). Accordingly, the ECPA claims are time-barred.

### 5. Common-Law Fraud Claims

The plaintiff's state-law claims are also untimely.[5] For the plaintiff's claim of fraud, the relevant limitations period is "the

---

[5] The defendants rely exclusively on New York law in arguing that the plaintiff's state-law claims must be dismissed, and the plaintiff does not dispute that New York law applies. Accordingly, New York law governs the plaintiff's state-law claims. See Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such implied consent . . . is sufficient to establish choice of law."); Pepper v. Fluent Inc., No. 21-cv-6581, 2023 WL 4561798, at *7 (S.D.N.Y. July 17, 2023) (analyzing state-law issues under New York law "because the plaintiffs did not dispute the defendants' argument that New York law applies").

greater of six years from the date the cause of action accrued or two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213(8); see Sejin Precision Indus. Co. v. Citibank, N.A., 235 F. Supp. 3d 542, 550 (S.D.N.Y. 2016). In this case, the fraud claim is based on the plaintiff's allegations that the defendants made "untrue" "representations of material fact[]" about the plaintiff to his "business associates" and "investors." Compl. ¶ 229. Based on the nonconclusory factual allegations in the complaint, the last such misrepresentation was made on April 27, 2015, the date of the alleged mass emailing of false and denigrating statements to the plaintiff's contacts. See id. ¶¶ 155-56, 275. Thus, a six-year limitations period would have expired in 2021, well before the complaint was filed.

The plaintiff's fraud claim is also time-barred under the alternative two-year limitations period based on the "discovery rule." Sejin Precision, 235 F. Supp. 3d at 550. For the reasons set forth above with respect to the plaintiff's federal claims, any inference that the plaintiff did not uncover or could not have uncovered the alleged fraud until September 14, 2020 (two years before the commencement of the action) would be implausible. See id. at 551 (concluding, on a Rule 12(b)(6) motion to dismiss, that the "plaintiffs had ample opportunity to discover the basis for their fraud claims far earlier" than they asserted, because

the "plaintiffs [had] suffered losses [that] . . . would have put them on notice of possible fraud"); Gutkin v. Siegal, 926 N.Y.S.2d 485, 486 (App. Div. 2011) (ascribing "constructive knowledge" of a fraudulent scheme to the plaintiff as of the date of the alleged losses, because "[a]t that point, a reasonable [person] . . . would have investigated further"). In short, under either the six-year or two-year limitations period, the plaintiff's fraud claim is untimely.

### 6. Injurious Falsehood Claims

The plaintiff's injurious falsehood claim is subject to a one-year statute of limitations. See N.Y. C.P.L.R. § 215(3); Riddell Sports Inc. v. Brooks, 872 F. Supp. 73, 80 (S.D.N.Y. 1995). That claim is also predicated on the same allegedly "false and derogatory . . . websites, domains, emails[,] internet posts[,] and advertisements" underlying the plaintiff's Lanham Act claims. Compl. ¶¶ 234-35. As set forth in connection with the Lanham Act claims, the complaint identifies 2015 as the most recent year in which these materials were created, and it is plain that the plaintiff was aware of the resulting injuries as early as 2015. Indeed, the plaintiff alleged similar injuries in his July 2015 State Court Action against many of the same defendants. See July 2015 State Court Compl. ¶ 37 (alleging that the defendants, in posting certain of the online content at issue in this action, "falsely impugn[ed]" the plaintiff's "professional fitness and

23

abilities" in a manner that "would tend to injure the [p]laintiff in his trade or business"). Thus, at the latest, the plaintiff's injurious falsehood claim accrued at some point in 2015, and the one-year limitations period expired in 2016. See generally IDT Corp. v. Morgan Stanley Dean Witter & Co., 907 N.E.2d 268, 273 (N.Y. 2009) (in New York, "[a] tort claim accrues as soon as the claim becomes enforceable, i.e., when all elements of the tort," including "damages," "can be truthfully alleged in a complaint"). Thus, the claim is time-barred. See Riddell, 872 F. Supp. at 80 (granting motion to dismiss injurious falsehood counterclaim where the claimant did not allege any "specific statements" "constitut[ing] injurious falsehood" within the one-year limitations period).

### 7. Tortious Interference Claims

The plaintiff's claim of tortious interference with prospective business relations is likewise untimely under the applicable three-year statute of limitations. See Radin v. Albert Einstein Coll. of Med. of Yeshiva Univ., No. 04-cv-704, 2005 WL 1214281, at *15 (S.D.N.Y. May 20, 2005); Demas v. Levitsky, 738 N.Y.S.2d 402, 408 (App. Div. 2002). While the plaintiff asserts broadly that the defendants are liable for tortious interference based on a "myriad of wrongs," Compl. ¶ 241, the only specific allegations pertaining to this claim are those concerning the April 27, 2015 mass emailing incident, see, e.g., id. ¶¶ 122-23, as well as the other alleged uses of online postings and videos to

"mislead[]" the plaintiff's business contacts in 2014 and 2015.
See id. ¶ 150 (plaintiff's "prospective investors" "encountered a
barrage" of disparaging online content in "2014"); id. ¶¶ 158-61,
163 ("[p]laintiff was denied valuable business opportunities" as
a result of the online materials created in 2014 and 2015); see
also id. ¶¶ 243, 249, 253. Accordingly, the tortious interference
claim accrued long before September 14, 2019, the date three years
prior to the initiation of this action.[6] The tortious interference
claim is therefore untimely.

### 8. Intentional Infliction of Emotional Distress and Prima Facie Tort Claims

The plaintiff's last two causes of action are the claims
of intentional infliction of emotional distress and prima facie
tort. The claim of intentional infliction of emotional distress
is subject to a one-year statute of limitations. Ross v. Louise
Wise Servs., Inc., 868 N.E.2d 189, 197 (N.Y. 2007); Patterson v.
Balsamico, 440 F.3d 104, 112 n.4 (2d Cir. 2006). As for the prima
facie tort claim, New York courts differ with respect to whether
a one-year or three-year limitations period applies. See, e.g.,
McKenzie v. Dow Jones & Co., 355 F. App'x 533, 535 (2d Cir. 2009)

---

[6] Notably, the plaintiff asserted a claim of tortious interference with
prospective business relations in his July 2015 State Court Complaint
based on the posting of disparaging online content "[i]n around April
2015." July 2015 State Court Compl. ¶¶ 28, 43-46. Thus, it is plain
that the plaintiff was on notice of the alleged interference and the
associated damages at that point in time.

(citing New York cases). In this case, the plaintiff has failed to allege any conduct within the three-year period preceding the filing of the complaint (much less within a one-year period) that would suffice to state either type of claim. Thus, the claims of intentional infliction of emotional distress and prima facie tort must be dismissed as untimely.

* * *

The plaintiff does not dispute the length of any of the relevant limitations periods. Rather, the plaintiff argues that the various statutes of limitations do not apply because some of the misconduct at issue is "ongoing" or occurred "recently." Pl.'s Opp'n at 8-9, 12. But the plaintiff cannot rely on such vague and conclusory assertions to reset the clock on the applicable statutes of limitations. Tellingly, while the plaintiff's response purports to identify examples of "recent[]" or "ongoing" misconduct by the defendants, all of those examples either correspond to time-barred allegations in the complaint or conspicuously omit any date.[7] Moreover, to the extent the complaint contains allegations

---

[7] For example, the plaintiff's response refers to the creation of various "YouTube videos and websites," all of which are alleged to have been created in 2014 and 2015. See Pl.'s Opp'n at 12; Compl. ¶¶ 150, 152, 158. Without providing dates, the plaintiff also points to an incident in which his computer was hacked and information was stolen for the purpose of disseminating harmful material (a clear reference to the April 2015 hacking alleged in the complaint), and to an incident in which the defendants posted clips from the plaintiff's deposition testimony online (a clear reference to the YouTube video containing distorted deposition footage, which, as indicated in an exhibit to the complaint, was posted seven years before the complaint was filed). See

that do concern events within any relevant limitations period, those allegations relate to Frydman's purported manipulation of the legal system generally, not to the alleged litigation misconduct that specifically caused injury to the plaintiff. See, e.g., Compl. ¶¶ 64-67, 101 (citing examples of Frydman's alleged "abusive use of the judicial system" from 2017 and 2021). Alleged instances of litigation abuse affecting the public or third parties, but with no relation to the plaintiff's own claims of injury, cannot salvage his time-barred causes of action.[8]

Ultimately, it is plain on the face of the complaint that the plaintiff was on notice of all of his alleged injuries far earlier than he now asserts, and that each of the applicable limitations periods expired long before the plaintiff filed his complaint. Thus, all of the plaintiff's claims must be dismissed as time-barred.

---

Pl.'s Opp'n at 12; Compl. ¶¶ 121, 274, 275 (hacking incident); id. ¶ 161 (deposition-related YouTube video); Compl. Ex. I (seven-year-old YouTube video). The plaintiff also makes vague and wholly conclusory assertions that "hacking, deleting information and data is ongoing and came up recently," Pl.'s Opp'n at 12, and that certain defendants "[r]ecently . . . were responsible for submitting frivolous filings and manufacturing lawsuits," id. at 14 (citing Compl. ¶ 109), again without providing any years or dates. Finally, the plaintiff's response points to alleged misconduct related to a litigation involving an organization called "Our Place, Inc.," id. at 12-13, but the plaintiff fails to provide a single date and these allegations appear nowhere in the complaint. These arguments and allegations are insufficient to alter the conclusion that the plaintiff's claims are time-barred.

[8] Similarly, allegations that third parties only recently discovered Frydman's alleged pattern of litigation abuse are irrelevant to the question of when the plaintiff himself was on notice of his injuries. See, e.g., Compl. ¶¶ 117 & n.6, 118-19 (describing events surrounding a federal judge's discovery of Frydman's "abuse of the courts").

**B.**

The defendants also argue that all of the plaintiff's claims suffer from pleading deficiencies that require dismissal under Rule 12(b)(6), or alternatively under Rule 9(b), to the extent the claims sound in fraud. <u>See</u> Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). The motions to dismiss identify a whole host of potentially valid pleading defects, including many that pertain only to a single defendant or a subset of the defendants. For the most part, the following analysis focuses solely on pleading defects that are universal to all of the defendants -- and even with that limited focus, it is clear that each of the plaintiff's claims should be dismissed.

Preliminarily, in many respects, the plaintiff's roughly 300-paragraph complaint fails to satisfy the basic requirements of Federal Rule of Civil Procedure 8(a), which requires that a pleading "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[T]he purpose of Rule 8(a)(2) is to give fair notice of a claim and the grounds upon which it rests so that the opposing part[ies] may identify the nature of the case, respond to the complaint, and prepare for trial." <u>Elektra Entm't Grp., Inc. v. Barker</u>, 551 F. Supp. 2d 234, 238 (S.D.N.Y. 2008). Moreover, "it is well-established in this Circuit that plaintiffs cannot simply

lump defendants together for pleading purposes, and that Rule
8(a) is violated where a plaintiff, by engaging in group pleading,
fails to give each defendant fair notice of the claims against
it." Nesbeth v. N.Y.C. Mgmt. LLC, No. 17-cv-8650, 2019 WL 110953,
at *3 (S.D.N.Y. Jan. 4, 2019).

In this case, the plaintiff's complaint is not short and
plain, and it fails to give fair notice of which claims pertain
to which defendants. Throughout its roughly 300 paragraphs, the
complaint only occasionally specifies "which defendant[s] engaged
in what conduct." Nesbeth, 2019 WL 110953, at *3. Instead, the
complaint repeatedly alleges that "the defendants" undertook
certain unlawful acts, without identifying which of the 23 named
defendants participated in the misconduct at issue. With respect to
certain defendants, such as Monica Frydman, Levine, and the Frydman
Entities, the plaintiff's complaint contains no particularized
allegations of wrongdoing at all. For several other defendants,
such as Lebson, Hayes, and Edelman, the allegations of wrongdoing
are too sparse and conclusory to support any claim for relief.
See, e.g., Compl. ¶ 154 (only allegation of wrongdoing as to Lebson,
which states in conclusory fashion that a disparaging website was
created "with [the] participation" of "Lebson"); id. ¶¶ 56, 74,
109 (vague allegations as to Edelman and Hayes). Indeed, while
the complaint does contain nonconclusory allegations related to
some of the defendants, the only defendant who is alleged to have

participated in misconduct underlying each of the plaintiff's causes of action is Frydman. Nevertheless, with the exception of Count III (one of the two Lanham Act counts), the complaint states that each and every one of the 23 named defendants is liable for each of the 11 remaining causes of action set forth in the pleading.

At the very least, these fundamental Rule 8 defects would be enough on their own to justify dismissal of all of the plaintiff's claims against Monica Frydman, Levine, the Frydman Entities, Lebson, Hayes, and Edelman. But even setting these basic deficiencies aside, the complaint as a whole is subject to dismissal because the plaintiff has failed to plead certain required elements of each of his claims. The Court addresses each claim in turn.

### 1. RICO Claims

First, the plaintiff fails to state a civil RICO claim pursuant 18 U.S.C. §§ 1962(c), 1964. To establish such a claim, "a plaintiff must allege (1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity, as well as injury to business or property as a result of the RICO violation." Lundy v. Cath. Health Sys. of Long Island Inc., 711 F.3d 106, 119 (2d Cir. 2013). Section 1961(1) of the RICO statute in turn "sets forth an exhaustive list of predicate 'acts' that can constitute a pattern of 'racketeering activity.'" Williams v. Affinion Grp., LLC, 889 F.3d 116, 124 (2d Cir. 2018) (citing 18 U.S.C. § 1961(1)). Those acts include the predicate acts asserted in the plaintiff's

complaint: mail and wire fraud, 18 U.S.C. §§ 1341, 1343; Hobbs Act extortion, 18 U.S.C. § 1915; and obstruction of justice, 18 U.S.C. § 1503.[9] See Compl. ¶¶ 184-90.

"The elements of mail or wire fraud are (i) a scheme to defraud (ii) to get money or property (iii) furthered by the use of interstate mail or wires." Williams, 889 F.3d at 124. Moreover, in order to allege a "scheme to defraud," a plaintiff must plead a "material misrepresentation." Id. Importantly, the elements of both mail and wire fraud must be alleged "with particularity" pursuant to Federal Rule of Civil Procedure 9(b). Id.; see Fed. R. Civ. P. 9(b); Lundy, 711 F.3d at 119; Anatian v. Coutts Bank (Switzerland) Ltd., 193 F.3d 85, 88 (2d Cir. 1999). To satisfy that particularity requirement, the complaint "must detail the specific statements that are false or fraudulent, identify the

---

[9] The complaint makes passing references to other offenses listed as predicate acts in Section 1961(1), such as tampering with witnesses, 18 U.S.C. § 1512. However, the complaint makes no attempt to plead the discrete elements of those offenses, and the actual RICO count points only to mail and wire fraud, Hobbs Act extortion, and obstruction of justice as predicate acts. See Compl. ¶¶ 184-86, 190. The plaintiff also suggests that his other causes of action represent predicate "acts" in furtherance of the alleged RICO scheme. See, e.g., Pl.'s Opp'n at 10 (citing allegations of "public attacks based on false and misleading statements," "hacking," and tortious "interfer[ence] with business" as support for the RICO claim). However, for purposes of establishing a RICO claim, predicate acts are limited to certain state-law crimes and the "act[s] indictable under [the] various specified federal statutes" in Section 1961(1). Kim v. Kimm, 884 F.3d 98, 103 (2d Cir. 2018). Section 1961(1) therefore excludes the plaintiff's state-law tort claims, and it also omits the statutes underlying the plaintiff's other federal causes of action.

speaker, state when and where the statements were made, and explain why the statements were fraudulent." Williams, 889 F.3d at 124.

As set forth below in connection with the common-law fraud claim, the plaintiff fails to plead the circumstances and contents of the alleged misrepresentations in this case with the requisite particularity. The plaintiff's complaint describes many of the allegedly fraudulent statements in general and conclusory terms, and even the plaintiff's most detailed descriptions of individual misstatements fail to specify "the who, what, when, where, and why of the fraud at issue." Id. at 125. Moreover, the complaint lacks specific allegations sufficient to satisfy other elements of mail or wire fraud. While "the mail or wire communications themselves need not contain a false statement," id., a plaintiff must plausibly allege that the use of the mail or wire was "in furtherance of [the alleged] fraudulent scheme," Lundy, 711 F.3d at 119. In this case, the complaint does not allege any specific use of the mail at all, but instead makes a conclusory assertion that "mailings [occurred] between and among the Defendants, Co-Conspirators," and "other third parties." Compl. ¶¶ 103(a), 186(a). These "[b]are-bones allegations do not satisfy Rule 9(b)." Lundy, 711 F.3d at 119. Many of the plaintiff's references to the use of the wires are similarly conclusory.

Furthermore, a number of the plaintiff's wire fraud allegations pertain to the defendants' use of the wires to make

"false and fraudulent" court filings. See, e.g., Compl. ¶¶ 125,
126. The plaintiff also relies entirely on his descriptions of
coercive litigation tactics and fraudulent filings to support
his allegations of obstruction of justice, see, e.g., id. ¶¶ 125,
126, 190, and Hobbs Act extortion, id. ¶¶ 111-16, 144-47.[10] Notably,
the plaintiff makes no attempt to rebut the defendants' legal
argument that these allegedly fraudulent and abusive litigation
activities cannot qualify as RICO predicate acts as a matter of law.
See Kim v. Kimm, 884 F.3d 98, 104 (2d Cir. 2018) ("[A]llegations of
frivolous, fraudulent, or baseless litigation activities -- without
more -- cannot constitute a RICO predicate act."); see also Curtis
& Assocs., P.C. v. L. Offs. of David M. Bushman, Esq., 758 F.
Supp. 2d 153, 174 (E.D.N.Y. 2010) ("[T]he Congressional intent in
enacting RICO does not square with the absurd consequences and
contraventions of well-settled public policy which would inevitably
result from . . . [p]ermitting the litigation activities alleged
here to serve as RICO predicate acts[.]"). The plaintiff has
therefore abandoned the issue. See Wang v. Cloopen Grp. Holding
Ltd., --- F. Supp. 3d ---, No. 21-cv-10610, 2023 WL 2534599,
at *11 n.6 (S.D.N.Y. Mar. 16, 2023) (collecting cases); see also

---

[10] With respect to Hobbs Act extortion, the plaintiff also asserts,
without alleging a single supporting fact, that "the [d]efendants"
extorted property from him "through the wrongful use of actual and
threatened force, violence, and fear." Compl. ¶¶ 148, 184. These
boilerplate, conclusory allegations are insufficient to plead Hobbs
Act extortion.

Tarrant v. City of Mount Vernon, No. 20-cv-9004, 2021 WL 5647820, at *5 (S.D.N.Y. Dec. 1, 2021) ("Plaintiff chose . . . , by his silence [in response to a motion to dismiss], to waive and abandon any argument he could have made with respect to [certain claims].").

In any event, to the extent the plaintiff makes specific allegations of litigation abuse that relate to the alleged RICO scheme against him, those allegations are insufficient to support the predicate acts at issue. See, e.g., Curtis & Assocs., 758 F. Supp. 2d at 174-75 (collecting cases); Daddona v. Gaudio, 156 F. Supp. 2d 153, 161-62 (D. Conn. 2000) (concluding that allegations of a "pattern of racketeering activity" based on the defendants' "extensive litigation filing of false documents and affidavits" "at best amount[ed] to a vague abuse of process or malicious prosecution claim," and collecting cases holding that "allegations of malicious prosecution or abuse of process do not, on their own, suffice as predicate acts for a RICO violation"); see also Raney v. Allstate Ins. Co., 370 F.3d 1086, 1088 (11th Cir. 2004) (finding that an "alleged conspiracy to extort money through the filing of malicious lawsuits" could not support civil RICO claim based on Hobbs Act extortion); Carroll v. U.S. Equities Corp., No. 18-cv-667, 2019 WL 4643786, at *12 (N.D.N.Y. Sept. 24, 2019) (collecting cases to demonstrate that "the overwhelming weight of authority bars a civil RICO claim based on the use of the mail or wire to conduct allegedly fraudulent litigation activities").

In short, the plaintiff has failed to allege the predicate acts required to establish a pattern of racketeering activity, and accordingly, the civil RICO claims must be dismissed. Moreover, "because [the plaintiff] did not adequately allege a substantive violation of RICO," the RICO conspiracy claims are dismissed as well. First Cap. Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 182 (2d Cir. 2004).

### 2. Lanham Act Claims

The defendants also argue that the Lanham Act claims must be dismissed because the complaint fails to allege the plaintiff's ownership of a protected trademark or the defendants' misuse of such a trademark. The plaintiff brings claims for false designation of origin and unfair competition under Section 43(a) of the Lanham Act, which was enacted to "prevent consumer confusion and to protect the synonymous right of a trademark owner to control his product's reputation." Beastie Boys v. Monster Energy Co., 66 F. Supp. 3d 424, 445 (S.D.N.Y. 2014); see Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 198 (1985) (explaining that the purpose of the Lanham Act is to "provide[] national protection of trademarks"). Thus, to state a claim for unfair competition or false designation of origin, a plaintiff "must allege sufficient facts to establish, first, that the plaintiff's mark is entitled to protection, and second, that the defendant's use of [the] mark is likely to cause consumers confusion as to the origin or sponsorship

of its goods." OffWhite Prods., LLC v. Off-White LLC, 480 F. Supp. 3d 558, 563 (S.D.N.Y. 2020) (false designation of origin); AM Gen. LLC v. Activision Blizzard, Inc., 450 F. Supp. 3d 467, 486 (S.D.N.Y. 2020) (unfair competition).

The Lanham Act protects both registered and unregistered trademarks. See Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992). However, "[t]he main difference is that the owner of [an] unregistered mark does not benefit from the presumption of validity created by federally registering the mark." Now-Casting Econ., Ltd. v. Econ. Alchemy LLC, 628 F. Supp. 3d 501, 516 (S.D.N.Y. 2022). In determining whether "an unregistered mark is entitled to protection under" the Lanham Act, "the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable." Two Pesos, 505 U.S. at 768. Thus, an unregistered mark "must be sufficiently distinctive to distinguish the [mark holder's] goods from those of others." Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 116 (2d Cir. 2006); see Now-Casting Econ., Ltd., 628 F. Supp. 3d at 516. "A plaintiff can establish a mark as distinctive by showing that the mark is 'inherently distinctive,' i.e., intrinsically capable of identifying its source, or by demonstrating that the mark has acquired 'secondary meaning.'" Louis Vuitton Malletier, 454 F.3d at 116 (quoting Star Indus. v. Bacardi & Co., 412 F.3d 373, 381 (2d Cir. 2005)). Moreover, when an alleged trademark is

unregistered, "the burden is on the proponent" (here, the plaintiff) to establish "that its mark is a valid trademark." <u>Now-Casting Econ., Ltd.</u>, 628 F. Supp. 3d at 516.

In this case, the plaintiff has not adequately alleged that he owns a valid "mark [that] is entitled to protection." <u>OffWhite Prods.</u>, 480 F. Supp. 3d at 563. The complaint does not contain any allegation that the plaintiff owns a registered trademark, and the plaintiff appears to concede that no such registration exists. <u>See</u> Pl.'s Opp'n at 11 ("I understand [that] Lanham Act violations do not require that I own a registered trademark[.]"). Nor does the complaint plead the existence of any unregistered trademark with specifity. The plaintiff instead repeats the conclusory allegation that the defendants have used his "name and likeness and the name, likeness[,] and marks of [his] businesses," Compl. ¶¶ 205-07, 217-18, without providing any supporting facts or descriptions.[11] Put

---

[11] Moreover, to the extent the plaintiff intends to suggest that the use of his "name or likeness" is sufficient on its own to support his Lanham Act claims, <u>see</u> Pl.'s Opp'n at 11, that argument fails. Courts have recognized that the misuse of an individual's "name or likeness" may support a Lanham Act claim under a "false endorsement" theory -- that is, a theory that "a company or individual ha[s] used another's trademark to suggest an association without explicitly stating that a sponsorship or affiliation exists." <u>Beastie Boys</u>, 66 F. Supp. 3d at 446, 446-49 (outlining the history of false endorsement claims and the applicable legal standards). In this case, however, the plaintiff does not rely on a false endorsement theory. And in any event, false endorsement claims based on name or likeness require some showing that the plaintiff is sufficiently recognizable, such that the use of the plaintiff's name or likeness by another party might cause consumer confusion. <u>See</u> <u>Gibson v. SCE Grp., Inc.</u>, 391 F. Supp. 3d 228, 245 (S.D.N.Y. 2019) (explaining that "the strength of the mark" in a false endorsement case is based on the "level of recognition the celebrity has among the segment of the public to whom the goods are advertised"); <u>see also</u> <u>Beastie Boys</u>, 66 F.

differently, the complaint makes no attempt to plead that these marks are sufficiently distinctive to qualify for protection. Such conclusory allegations are insufficient to establish a valid mark, and accordingly, the Lanham Act claims must be dismissed.

### 3. CFAA Claims

Next, the plaintiff's CFAA claims must be dismissed for failure to allege the requisite "damage or loss." <u>See</u> 18 U.S.C. § 1030(g). The CFAA provides a civil cause of action to "[a]ny person who suffers damage or loss by reason of a violation" of the statute, so long as the underlying conduct "involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)." <u>Id.</u>; <u>see id.</u> § 1030(c)(4)(A)(i). In this case, the only potentially relevant factor is listed in subclause (I), which requires a showing of "loss to 1 or more persons during any 1-year period . . . aggregating at least

---

Supp. 3d at 448 (collecting cases where "courts in this District . . . found viable false endorsement claims" based on the use of a "celebrity's name and likeness"); <u>A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC</u>, 131 F. Supp. 3d 196, 206 (S.D.N.Y. 2015) ("In this District, courts recognize that celebrities hold a trademark-like interest in their name, likeness, and persona that may be vindicated through a false endorsement claim under Section 43(a)."). Here, the complaint is devoid of allegations that the plaintiff has attained some sort of celebrity status or is otherwise widely recognizable. Thus, any Lanham Act claim based on the alleged misuse of the plaintiff's name and likeness fails. <u>See, e.g.</u>, <u>Albert v. Apex Fitness, Inc.</u>, No. 97-cv-1151, 1997 WL 323899, at *1 (S.D.N.Y. June 13, 1997) (dismissing a Lanham Act claim based on false endorsement where the plaintiff, "a professional model," did "not claim that he [was] well known or a celebrity").

$5,000 in value."[12] Id. § 1030(c)(4)(A)(i)(I). As defined in the CFAA, the term "loss" "relates to costs caused by harm to computer data, programs, systems, or information services."[13] Van Buren v. United States, 141 S. Ct. 1648, 1659-60 (2021) (citing 18 U.S.C. § 1030(e)(11)). "Damage" means "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). As the Supreme Court explained in Van Buren, these "statutory definitions of 'damage' and 'loss' thus focus on technological harms -- such as the corruption of files -- of the type unauthorized users cause to computer systems and data." 141 S. Ct. at 1660.

While the plaintiff alleges that the defendants accessed his computer without authorization and thereby "obtained" a list of email addresses for his business contacts, see Compl. ¶¶ 151, 274, the plaintiff nowhere alleges that this conduct compromised the "integrity or availability" of the stored information itself

---

[12] The other relevant factors are "the modification or impairment" of some "medical examination, diagnosis, treatment, or care" (subclause II); "physical injury" (subclause III); "a threat to public health or safety" (subclause IV); and "damage affecting a computer used by or for an entity of the United States Government" for certain purposes (subclause V). 18 U.S.C. § 1030(c)(4)(A)(i)(II)-(V). The plaintiff's complaint cannot reasonably be construed as asserting a CFAA claim based on any of these other factors.

[13] The CFAA's full definition of "loss" is "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

or otherwise caused harm to the computer. 18 U.S.C. § 1030(e)(8). The plaintiff also fails to allege that he incurred any costs to assess or repair the computer system, or that he suffered any economic consequences flowing from an "interruption of [computer] service." Id. § 1030(e)(11). Rather, the plaintiff asserts only that the "value of the Email List" was "greater than $5,000,000," and that he lost business opportunities as a result of the alleged dissemination of disparaging material to the contacts on that list. Compl. ¶¶ 276-77, 286, 288-89. These alleged injuries cannot support a CFAA claim, because they have no relation at all to some harm to the "targeted computer." Better Holdco, Inc. v. Beeline Loans, Inc., No. 20-cv-8686, 2021 WL 3173736, at *3 (S.D.N.Y. July 26, 2021) (collecting cases); see also New London Assocs., LLC v. Kinetic Social LLC, 384 F. Supp. 3d 392, 412 (S.D.N.Y. 2019) (dismissing CFAA claim where "[t]here [was] no allegation . . . that [the plaintiff's] alleged economic losses arose from damage to, or [the inoperability] of, any of the allegedly accessed computers"); Garland-Sash v. Lewis, No. 05-cv-6827, 2011 WL 6188712, at *3 (S.D.N.Y. Dec. 6, 2011) ("'[D]amage' [and] 'loss' under [the] CFAA are inextricably intertwined with a harm to the computer system itself, its data, or delivery of service."). Moreover, because the plaintiff has not alleged any "loss" within the meaning of the statute, the complaint plainly cannot satisfy the $5,000 "loss" threshold required to state a civil claim. 18 U.S.C. § 1030(g);

id. § 1030(c)(4)(A)(i)(I); see, e.g., Reis, Inc. v. Lennar Corp., No. 15-cv-7905, 2016 WL 3702736, at *7 (S.D.N.Y. July 5, 2016) (dismissing CFAA claim because the plaintiffs "failed to allege that they ha[d] met the $5,000 jurisdictional threshold"). Thus, the plaintiff's CFAA claims must be dismissed.[14]

### 4. ECPA Claims

The plaintiff similarly fails to state an ECPA claim. The ECPA makes it unlawful to "intentionally intercept[], endeavor[] to intercept, or procure[] any other person to intercept" a wire, oral, or electronic communication, or to use or disclose the contents of any such communication "knowing or having reason to know that the information was obtained" in violation of statute. 18 U.S.C. § 2511(1)(a)-(d). The statute defines "intercept" to mean "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Id. § 2510(4). While the Court of Appeals for the Second Circuit has not addressed the question, "[v]irtually every federal appellate court to have considered the issue has held that an 'intercept' under the ECPA must occur simultaneously

---

[14] This dismissal applies not only to the plaintiff's substantive CFAA claims, see 18 U.S.C. § 1030(a), but also to the CFAA conspiracy claims, see id. § 1030(b), because both require satisfaction of the same $5,000 "loss" threshold. See Espire Ads LLC v. TAPP Influencers Corp., No. 21-cv-10623, 2023 WL 1968025, at *15 n.12 (S.D.N.Y. Feb. 13, 2023) ("[B]ecause the [] plaintiffs have failed to allege loss above the jurisdictional threshold, the CFAA conspiracy claim fails for the same reason as their substantive CFAA claims."); Reis, 2016 WL 3702736, at *7 (similar).

with transmission" of the communication. <u>Pure Power Boot Camp,</u>
<u>Inc. v. Warrior Fitness Boot Camp, LLC</u>, 759 F. Supp. 2d 417, 430
(S.D.N.Y. 2010); <u>see also</u> <u>Fraser v. Nationwide Mut. Ins. Co.</u>, 352
F.3d 107, 113 (3d Cir. 2003) (collecting cases). Courts in this
Circuit likewise "construe[] 'intercept' narrowly to require that
the interception of an electronic communication be contemporaneous"
with the communication's transmission. <u>Tantaros v. Fox News</u>
<u>Network, LLC</u>, No. 17-cv-2958, 2018 WL 2731268, at *7 (S.D.N.Y.
May 18, 2018) (collecting cases).

In this case, the complaint is devoid of allegations
suggesting that the defendants intercepted any communication
contemporaneously with its transmission. Rather, the plaintiff
asserts generally that the defendants "obtained" a list of email
addresses stored on the plaintiff's computer. Compl. ¶ 151. Absent
any allegations of contemporaneous interception, the plaintiff's
ECPA claim must be dismissed. <u>See, e.g.</u>, <u>Tantaros</u>, 2018 WL 2731268,
at *8 (dismissing an ECPA claim under Rule 12(b)(6) in part
because "there [was] <u>no</u> allegation that any communications were
intercepted contemporaneously with when they were made").

### 5. Common-Law Fraud Claims

Turning to the state-law causes of action, the defendants
argue that the plaintiff's fraud claim must be dismissed because
the plaintiff has failed to plead the fraud with particularity.
It is well-established that "[a] claim for common law fraud is

subject to the particularity pleading requirements of Federal Rule of Civil Procedure 9(b)," Fin. Guar. Ins. Co. v. Putnam Advisory Co., 783 F.3d 395, 402-03 (2d Cir. 2015), under which a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent," ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007); see MSV Synergy, LLC v. Shapiro, No. 21-cv-7578, 2022 WL 4096163, at *8 (S.D.N.Y. Sept. 7, 2022). In this case, the plaintiff asserts that the defendants made "numerous" misrepresentations of "material fact[]," Compl. ¶ 229, but many of the alleged misrepresentations are described in broad brushstrokes, without the details necessary to satisfy Rule 9(b). For example, the complaint's repeated references to "videos," "websites," "advertisements," "blogs," and other "internet posts" containing "false," "libelous," "defamatory," and "fraudulent" material, without specific allegations as to the contents of each statement or the surrounding circumstances, are far too general and ambiguous to satisfy Rule 9(b). See, e.g., Compl. ¶¶ 4, 150, 160, 206-08.

The plaintiff does set forth some nonconclusory allegations with respect to the circumstances of other alleged instances of fraud, such as the creation of www.thetruthabouteliverschleiser.com and the posting of the YouTube video containing distorted deposition

footage. See, e.g., id. ¶¶ 152, 156, 158, 160-61. However, the
complaint fails to specify the allegedly fraudulent statements
in each of these items. Instead, the plaintiff simply describes
the website and YouTube video as "defamatory and libelous." Id.
¶¶ 156, 160. These generalized descriptions are insufficient for
purposes of Rule 9(b).

The only allegations that perhaps come close to satisfying
the particularity requirement are those concerning (1) the February
23, 2015 press release and press conference, see id. ¶¶ 166-69,
and (2) the April 27, 2015 mass dissemination of emails featuring
disparaging content about the plaintiff, see, e.g., id. ¶¶ 122,
155, 275; see also Compl. Ex. E, ECF No. 1-5 (copy of the April
27, 2015 email). But even assuming the plaintiff has alleged a
misrepresentation with particularity, the fraud claim fails for
an independent reason: the complaint does not plausibly allege
one of the "essential elements" of a New York common-law fraud
claim, namely, "justifiable reliance by the plaintiff." Tenamee v.
Schmukler, 438 F. Supp. 2d 438, 445-46 (S.D.N.Y. 2006) (plaintiff
"failed to state a claim for fraud" where complaint lacked "an
allegation as to his own detrimental reliance on the asserted
false statement"). The complaint contains no allegations from
which a court could infer that the plaintiff relied on any of
the purported misstatements. Instead, the plaintiff's theory of
fraud is that the defendants' misrepresentations deceived the

plaintiff's "investors and business associates," causing those third parties to terminate their business with the plaintiff. Compl. ¶ 229. However, the New York Court of Appeals has made clear that "under New York law, [] third-party reliance does not satisfy the reliance element of a fraud claim." Pasternack v. Lab'y Corp. of Am. Holdings, 59 N.E.3d 485, 491 (N.Y. 2016). The plaintiff has therefore failed to plead reliance with respect to any of the alleged misrepresentations, and accordingly, the fraud claim must be dismissed.[15]

### 6. Tortious Interference Claims

The plaintiff's allegations of tortious interference are also insufficient. To state a claim of tortious interference with prospective business relations, "the plaintiff must allege that (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." Kirch v. Liberty Media Corp., 449 F.3d 388, 400 (2d Cir. 2006). As the Court of Appeals for the Second Circuit has explained, the New York courts

---

[15] In Pasternack, the New York Court of Appeals suggested that a third party may be relevant to the reliance inquiry in limited circumstances where "the third party acted as a conduit to relay the false statement to [the] plaintiff, who then relied on the misrepresentation to his detriment." 59 N.E.3d at 492. There is no allegation of this sort of "indirect communication" in this case. Id.

reject tortious interference claims when those claims rely on "only a general allegation of interference with [third parties] without any sufficiently particular allegation of interference with a specific contract or business relationship." 16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 262 (2d Cir. 2015) (quoting McGill v. Parker, 582 N.Y.S.2d 91, 95 (App. Div. 1992)). In this case, the plaintiff has not specified a single professional relationship or anticipated transaction with which the defendants interfered. Rather, the complaint makes only vague and conclusory references to the allegedly affected business relationships, using terms such as "investors," "contractors," "business associates," "sellers," and "individuals and companies." See, e.g., Compl. ¶¶ 51, 123, 150, 240-41, 249-51. Because the plaintiff has failed to allege "any specific business relationship," the tortious interference claim "should be dismissed." Garvey v. Face of Beauty LLC, 634 F. Supp. 3d 84, 95 (S.D.N.Y. 2022) (emphasis in original) (collecting cases); Com. Data Servers, Inc. v. Int'l Bus. Mach. Corp., 166 F. Supp. 2d 891, 898 (S.D.N.Y. 2001) ("The complaint refers only generally to [] alleged relationships with [third parties] without identifying any particular [third parties] . . . . That allegation is far too vague to support a claim for tortious interference.").

### 7. Injurious Falsehood and Prima Facie Tort Claims

Next, the claims of injurious falsehood and prima facie tort must be dismissed because the plaintiff fails to allege special

damages in connection with either claim. See Korova Milk Bar of
White Plains, Inc. v. PRE Props., LLC, No. 11-cv-3327, 2013 WL
417406, at *16 (S.D.N.Y. Feb. 4, 2013) (listing special damages
as a required element of an injurious falsehood claim); Restis
v. Am. Coal. Against Nuclear Iran, Inc., 53 F. Supp. 3d 705, 730
(S.D.N.Y. 2014) (same with respect to a prima facie tort claim).
The plaintiff does not identify any specific economic or pecuniary
loss incurred as a result of the defendants' alleged misconduct.
Instead, the complaint asserts generally that the defendants
caused injury to the plaintiff, resulting in damages "believed to
be not less than $100 million." Compl. ¶ 237 (injurious falsehood);
id. ¶ 271 (prima facie tort). These allegations, which set forth
the plaintiff's damages in "round figures" without any "attempt
at itemization," are plainly insufficient to satisfy the "special
damages" element of either claim.[16] Bilinski v. Keith Haring Found.,
Inc., 632 F. App'x 637, 641 (2d Cir. 2015) (affirming dismissal of
injurious falsehood and prima facie tort claims for failure to plead
special damages); Conte v. Newsday, Inc., 703 F. Supp. 2d 126, 149

---

[16] The prima facie tort claim also fails for the independent reason
that the claim appears to duplicate the plaintiff's other state-law
causes of action. See Nevin v. Citibank, N.A., 107 F. Supp. 2d 333,
346-47 (S.D.N.Y. 2000) ("[A] claim for prima facie tort . . . is highly
disfavored in New York . . . [and] it is well settled that any claim
that is covered by a traditional tort cannot be the basis for a claim
of prima facie tort -- even if the traditional tort claims turn out not
to be viable."). Relatedly, to the extent the prima facie tort claim
relies on the plaintiff's allegations concerning "the dissemination of
allegedly defamatory materials, that cause of action must fail" as a
matter of law. McKenzie, 355 F. App'x at 536.

(E.D.N.Y. 2010) (dismissing injurious falsehood claim for failure to plead special damages "with the requisite specificity" and collecting cases); see also NE Brands LLC v. Seattle Pac. Indus., Inc., No. 19-cv-7420, 2020 WL 4287989, at *2 (S.D.N.Y. July 27, 2020) (dismissing prima facie tort claim and explaining that "a plaintiff must do more than simply allege a round number that is speculative and conclusory, [because] special damages must be stated in detail").

### 8. Intentional Infliction of Emotional Distress Claims

Finally, the defendants argue that the plaintiff has failed to state a claim for intentional infliction of emotional distress. The plaintiff does not respond to that contention or make any other argument regarding the emotional distress claim, and accordingly, the claim has been abandoned. See Wang, 2023 WL 2534599, at *11 n.6. In any event, this claim also fails because the plaintiff has not pleaded "severe emotional distress" with any specificity. See Howell v. N.Y. Post Co., 612 N.E.2d 699, 702 (N.Y. 1993) (listing "severe emotional distress" as a required element of this tort). The complaint simply asserts that the "[p]laintiff has suffered and will continue to suffer severe emotional distress" justifying "$1 Billion" in damages, without alleging any supporting details or facts regarding the nature of the distress. Compl. ¶¶ 265-66. Because the plaintiff "has not alleged any facts to support [his] conclusory assertion that [he] suffered severe emotional distress,"

the claim for intentional infliction of emotional distress must be dismissed. <u>Tantaros</u>, 2018 WL 2731268, at *10 (collecting cases); see <u>Medcalf v. Walsh</u>, 938 F. Supp. 2d 478, 490 (S.D.N.Y. 2013) (dismissing claim where the complaint lacked "any non-conclusory allegation that [the plaintiff] suffered severe emotional distress").

\* \* \*

In short, the plaintiff has not sufficiently alleged one or more elements of each of his claims. Thus, the defendants' motions to dismiss the plaintiff's claims under Rule 12(b)(6) and Rule 9(b) are **granted** on the grounds set forth above.[17]

**IV.**

The plaintiff has requested leave to amend his complaint in the event that his claims are dismissed. Pl.'s Opp'n at 5. As a general matter, courts "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, "it is within the sound discretion of the district court to grant or

---

[17] In support of their motions to dismiss, the defendants also argue, <u>inter alia</u>, that (1) the plaintiff's claims should have been asserted as compulsory counterclaims in previous litigation involving many of the same parties, see Fed. R. Civ. P. 13(a), and are therefore barred under the doctrine of <u>res judicata</u>; (2) this action is foreclosed in light of the "two dismissal" rule of Federal Rule of Civil Procedure 41(a)(1)(B), and (3) many of the defendants were not properly served. In light of the Court's conclusions that all of the claims are time-barred and inadequately alleged (and, furthermore, that the plaintiff has abandoned any argument regarding personal jurisdiction over Davis and the Levick Defendants), it is not necessary to address the other arguments raised in the defendants' various motions.

deny leave to amend," <u>Green v. Mattingly</u>, 585 F.3d 97, 104 (2d Cir. 2009), and a request for leave to amend may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party," <u>Holmes v. Grubman</u>, 568 F.3d 329, 334 (2d Cir. 2009).

It is plain that good reason to deny leave to amend exists here. First, even with an opportunity to amend his complaint, the plaintiff could not plausibly overcome many of the pleading defects outlined above -- and in any event, all of the plaintiff's claims are clearly time-barred. While the plaintiff's response purports to identify factual allegations indicating that some of the alleged misconduct was "recent" or "ongoing," including new allegations not included in the complaint, <u>see</u> Pl.'s Opp'n at 12-14, those allegations fall far short of what would be necessary to toll or reset the applicable limitations periods. Under such circumstances, it is clear that granting leave to amend would be futile. <u>See, e.g.</u>, <u>Jordan v. Chase Manhattan Bank</u>, 91 F. Supp. 3d 491, 510 (S.D.N.Y. 2015) (concluding that "granting leave to amend would be futile" with respect to "claims that are barred by the statute of limitations" because "better pleading will not cure the defect").

Moreover, this action is not the first of its kind. The plaintiff has brought multiple lawsuits against Frydman and his alleged affiliates, including a number of the defendants named here. <u>See</u> Edelman Memo., ECF No. 70, at 1 n.2 (collecting dockets

of 13 different litigations between the plaintiff, Frydman, and their respective corporate entities, including several cases that the plaintiff initiated). These lawsuits include the July 2015 State Court Action described above, which asserted claims arising out of the posting of some of the allegedly disparaging online content at issue in this complaint. And more recently, in January 2022, the plaintiff brought a federal action strikingly similar to this one, asserting an identical set of claims against many of the defendants now named in this case. See Compl., ECF No. 1, Verschleiser v. Frydman, No. 22-cv-601 (S.D.N.Y. filed Jan. 21, 2022). The plaintiff then voluntarily dismissed that lawsuit in August 2022, only to file this one less than a month later. Thus, this action represents a repeated attempt by the plaintiff to assert precisely the same legal theories against many of the same defendants based on the same set of facts, as well as one of several attempts to initiate litigation against Frydman and his affiliates generally. The plaintiff, therefore, has already had ample opportunity to revise and supplement his claims. Cf. Gray v. Amazon.com, Inc., No. 21-cv-116, 2021 WL 1909737, at *4 (N.D.N.Y. May 12, 2021) (granting motion to dismiss and concluding that "leave to amend would be futile" "[i]n light of the lack of factual allegations in the complaint, [the] [p]laintiff's recent history as a serial litigator, and because [the plaintiff] was previously afforded an opportunity to amend her allegations . . . in her

51

previous lawsuit against [the defendant]"). The plaintiff, who seeks one billion dollars in damages, see Compl. ¶ 266, should not be afforded another opportunity to pursue this abusive lawsuit.

In sum, the plaintiff's request for leave to amend is **denied**, and the complaint is **dismissed with prejudice**.

## CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically addressed above, those arguments are either moot or without merit. For the foregoing reasons, all of the defendants' motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6), and, where applicable, Rule 9(b), are **granted**. Likewise, the Rule 12(b)(2) motions to dismiss for lack of personal jurisdiction as to Davis and the Levick Defendants are **granted**. The plaintiff's request for leave to amend the complaint is **denied**, and the complaint is **dismissed with prejudice**.

The Clerk of Court is respectfully directed to mail a copy of this Memorandum Opinion and Order to the pro se plaintiff, to close all pending motions, and to close this case.

**SO ORDERED.**

Dated:     New York, New York
           September 7, 2023

                                        _____
                                            **John G. Koeltl**
                                        **United States District Judge**